# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN A. GALLAGHER, | ) | CASE NO. 5:16-cv-01831 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security,* | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Susan A. Gallagher (hereinafter "Plaintiff"), challenges the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter "Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. Procedural History

On February 26, 2013 and March 7, 2013, Plaintiff filed applications for POD, DIB, and SSI respectively, alleging a disability onset date of June 15, 2006.[1] (R. 12, Transcript ("Tr.") 191-205). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 127-147). Plaintiff participated in the hearing on January 16, 2015, was represented by counsel, and testified. (Tr. 36-76). A vocational expert ("VE") also participated and testified. *Id.* On February 6, 2015, the ALJ found Plaintiff not disabled. (Tr. 26). On May 23, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4). On July 20, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 14, 15 & 16).

Plaintiff asserts the following assignments of error: (1) the ALJ erred in his handling of the opinion of her treating psychiatrist, and (2) the ALJ failed to properly weigh the opinions of the State agency psychological consultants. (R. 14, PageID# 945).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in 1973 and was 32-years-old on the alleged disability onset date. (Tr. 191). She had a high school education, some college education, and was able to communicate in English. (Tr. 24, 37, 39-40). She had past relevant work as a home health aide, daycare worker, and a cashier-checker. *Id.*

---

[1] According to the decision, Plaintiff only had sufficient quarters of coverage until December 31, 2007. (Tr. 14).

**B. Relevant Medical Evidence**[2]

**1. Treatment Records**

On March 31, 2006, Plaintiff was seen by advanced practice registered nurse Will D. Benson, APRN-BC, after being referred by a counselor for evaluation of her medication. (Tr. 782-783). Plaintiff's chief complaint was financial problems, her husband's medical issues, and her long history of depression. (Tr. 782). She was diagnosed with depressive disorder, NOS, and psychotic disorder, NOS. (Tr. 783). She was assigned a Global Assessment of Functioning ("GAF") score of 55.[3] *Id*. She was continued on Wellbutrin and was told to continue counseling. *Id*.

After a several year gap in treatment, on April 13, 2012, Plaintiff was seen for a diagnostic assessment at the Coleman Community Mental Health Center with Paul Sarsany, PC-CR. (Tr. 379-396). Mr. Sarsany diagnosed depressive disorder NOS, anxiety disorder NOS, and ascribed her a GAF score of 55, indicating moderate symptoms. (Tr. 395-396).

---

[2] The recitation of the evidence is not intended to be exhaustive. As Plaintiff's assignment of error revolve around her mental impairments, the court foregoes any discussion of Plaintiff's medical treatment related to physical impairments. Furthermore, it includes only those portions of the record cited by the parties in their briefs *and* also deemed relevant by the court to the assignments of error raised.

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicative of more severe mental impairments. A GAF score between 51 and 60 indicates *moderate* symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) (DSM-IV). Notably, an update of the DSM in 2013 eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

On April 23, 2012, Plaintiff reported that she believed her house was haunted by her grandparents and great-grandparents. (Tr. 328).

On January 17, 2013, Plaintiff reported that her teenage daughter had been experiencing suicidal ideation. (Tr. 369).

On February 8, 2013, Plaintiff was seen by Richard Chenevey, MA, who diagnosed her with: (1) bipolar affective disorder, mixed, severe degree, specified as with psychotic disorder; (2) agoraphobia with panic disorder; (3) interpersonal problems, not elsewhere classified; and (4) posttraumatic stress disorder. (Tr. 320).

On February 11, 2013, Plaintiff was first seen by Ikem Nkanginieme, M.D. (hereafter "Dr. Ike") due to having a nervous breakdown. (Tr. 321). On mental status exam, Dr. Ike described Plaintiff as "good eye contact, well groomed, good hygiene, cooperative and friendly." (Tr. 322). Her psychomotor activity and speech were normal, her mood was odd/guarded, her affect was congruent with mood, and she was paranoid. *Id*. Her thought process was goal directed, she had no suicidal/homicidal ideation but was delusional, and her judgment was fair to poor. *Id*. He assessed a GAF score of 52. *Id*.

On April 8, 2013, Plaintiff reported experiencing "PTSD flashbacks with autonomic arousal and phobia." (Tr. 551). Dr. Ike assessed a GAF score of 52. (Tr. 552).

On September 13, 2013, Plaintiff was seen by Mr. Chenevey and "discussed her ongoing stressors paying the bills, getting her husband and daughter to and from school and school activities, dealing with her housing problems, etc." (Tr. 693). Plaintiff reported stress managing the household and paying the bills. *Id*.

On November 20, 2013, Plaintiff reported to Dr. Ike an uptick in her depression and anxiety

to moderate levels after having to deal with her ex-husband. (Tr. 689). She related she was having a lot of financial problems. *Id*. On mental status examination, Dr. Ike described Plaintiff as "variable eye contact, well groomed, good hygiene, cooperative and friendly." (Tr. 690). Her psychomotor activity and speech were normal, her mood was anxious, her affect was congruent with mood, she was not paranoid or delusional and had no homicidal/suicidal ideation. *Id*. Her thought process was goal directed, her judgment was fair, but her concentration was impaired. *Id*. Nevertheless, Dr. Ike lowered Plaintiff's GAF score to 40-45, indicative of serious symptoms. *Id*.

On January 3, 2014, Plaintiff was seen by Natalie Malloy, MA, LPCC. (Tr. 688). On mental status exam, Plaintiff presented similarly as she did to Dr Ike, *supra*, and she was noted to be depressed. *Id*.

On January 16, 2014, Plaintiff reported to Dr. Ike that she was having suicidal thoughts without current intent. (Tr. 684). She also reported sleeping only 4-5 hours per night. *Id*. She was isolating more (TR 684). Her mental status on examination remained unchanged from November of 2013 except that her mood was depressed rather than anxious. (Tr. 685). Her GAF score remained at 40-45. *Id*.

On May 1, 2014, Plaintiff returned to Dr. Ike complaining of worsening anxiety and depression stemming from financial difficulties and a cut to her food stamp allowance due to her husband being on sanctions. (Tr. 657). On mental status examination, she was irritable, anxious, and angry, with limited insight and judgment. (Tr. 666-667). Her GAF score remained 40-44. (Tr. 667).

On October 28, 2014, Plaintiff was seen by Jan Murphy, LPCC, who noted Plaintiff came to the session "looking upbeat today and yet when I asked her about it, she said she was in the

throes of anxiety and nervousness. She has been off her Lorazepam for 3 weeks and is feeling it very badly …" (Tr. 721). On mental status examination, she was oriented x 5, had normal psychomotor activity and speech, her insight/judgment were fair, her mood was anxious and depressed, and her thought process was logical. *Id*. She had no suicidal/homicidal ideation. *Id*. Plaintiff was stressed over having to pay a $200 cellphone bill. *Id*.

On October 29, 2014, Plaintiff was seen by Dr. Ike. (Tr. 718). Her mental status examination remained largely unchanged from her last visit with him except that her insight/judgment improved to fair. (Tr. 718). Dr. Ike lowered Plaintiff's GAF score to less than 40. *Id*.

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

On April 24, 2013, State agency psychological consultant Leslie Rudy, Ph.D. opined that Plaintiff was *not significantly limited* in her ability to: (1) carry out short and simple instructions or detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work-related decisions; (7) ask simple questions or request assistance; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 84-85). However, Dr. Rudy opined that Plaintiff was *moderately limited* in her ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length

6

of rest periods; (2) interact appropriately with the general public; and, (3) accept instructions and respond appropriately to criticism from supervisors. *Id*. Dr. Rudy noted that Plaintiff "would perform best in an isolated environment." (Tr. 85).

On July 1, 2013, State agency medical consultant Dimitri Teague, M.D., opined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 118).

On July 9, 2013, State agency psychological consultant Irma Johnston, Psy.D., offered an opinion identical to that of Dr. Rudy. (Tr. 118-119). She reiterated Dr. Rudy's comment that Plaintiff "would perform best in an isolated environment," adding that "[s]he can relate infrequently with others." (Tr. 119).

On January 8, 2015, Dr. Ike and Ms. Murphy both signed a checklist questionnaire containing the following assessment of Plaintiff's ability to perform mental work-related activities. (Tr. 779-780). Plaintiff was deemed extremely limited in her ability to respond appropriately to changes in the work setting or to behave in an emotionally stable manner. *Id*. Plaintiff was assessed as markedly limited in her ability to relate to other people, to perform daily activities, to respond to customary work pressures, and to perform complex, repetitive, or varied tasks. (Tr. 779-780). The remaining limitations were all assessed as either mild or moderate. *Id*. The severity of these limitations was opined to have existed since at least December 31, 2007.[4] (Tr.780). They indicated that Plaintiff had bipolar affective disorder, agoraphobia with panic, and PTSD. (Tr. 780). They noted Plaintiff improved with medication.

---

[4] There is no indication that either Dr. Ike or Ms. Murphy had ever seen or treated Plaintiff before 2013.

*Id.* They checked boxes indicating Plaintiff would deteriorate if placed under the stress of a job and would be absent more than three times per month. *Id.* There is no additional explanation for the above limitations beyond the cited diagnoses. (Tr. 779-780).

## C. Relevant Hearing Testimony

At the January 2015 hearing, Plaintiff testified as follows:

- She lives with her husband and her seventeen-year old daughter. (Tr. 39).

- She attended some college at the University of Akron. (Tr. 39). She could not go back to college because she lost her student loan funding. (Tr. 40).

- She completed a vocational training program to become a licensed nurse aide. (Tr. 40-41). Her license has since expired. *Id.*

- She has a driver's license and drove herself to the hearing. (Tr. 42, 53).

- She is 5'1" tall and weighs 152 pounds. (Tr. 43).

- She last worked in 2012 as a home health aide. She quit after three days after working two twelve hour shifts. (Tr. 43-44). She testified that she quit because her employer refused to schedule her for any more shifts due to her being a cigarette smoker. (Tr. 44).

- Her current income included child support, food stamps, welfare, and medical benefits. (Tr. 43).

- In 2008 and 2009, she also worked as a home health aide for eleven months on a part-time basis, but did work full-time over a three week stretch. (Tr. 44-45). When she was employed as a home health aide, she typically spent three hours on her feet during a 12-hour shift. (Tr. 46).

- She was never able to work full-time because "hallucinations and other mental health issues get in the way." (Tr. 48). She had been having mental health issues since she was 15-years old. (Tr. 48).

- She has experienced both auditory and visual hallucinations. When she was in high school, she was prescribed medication that helped reduce her hallucinations, but did not completely eliminate them. She received counseling until she was 23-years old. (Tr. 49). She stopped attending counseling after she married her ex-husband who threatened her with taking away

their daughter. (Tr. 50).

• Currently, she felt overwhelmed and anxious. (Tr. 51). She continues to experience hallucinations a "couple times a week." (Tr. 52). She sees a counselor once a week and a psychiatrist once a month. (Tr. 52).

• She has been diagnosed with bipolar disorder and agoraphobia. The latter has gotten worse and she only goes to the grocery store and to medical appointments. Occasionally she goes out to eat with her husband and daughter. (Tr. 53). She also suffers from panic attacks once a month. (Tr. 54).

• She was last hospitalized when she was 22-years old. (Tr. 55).

• She goes grocery shopping once a week and drives herself. (Tr. 57).

• She uses an iPad and a smart phone, and likes to watch movies. (Tr. 58-59).

• She is able to do chores but sometimes she gets distracted. (Tr. 59).

• She has had a history of hallucinations. (Tr. 66-68).

The VE characterized Plaintiff's past work as follows: nurse assistant: Dictionary of Occupational Titles ("DICOT") 355. 674-014, semi-skilled, SVP of 4, medium exertional; daycare worker, DICOT 359.677-018, semi-skilled, SVP of 4, light exertional; and, cashier-checker, DICOT 211.462-014, semi-skilled, SVP of 3, light exertional. (Tr. 71).

The ALJ posed the following hypothetical question to the VE:

> [A]ssume an individual of the claimant's age, education, and work experience who is able to work at the light level as typically defined, can perform unskilled work that can be learned in 30 days or less, can perform work tasks in a static and low-stress environment -- which I define as one where the work tasks are routine, repetitive, and predictable, and where there are few changes that occur in the workplace, and that when changes do occur in the workplace those changes are introduced gradually and are easily explained or demonstrated -- where there are no high production quotas, no fast-paced demands or strict time requirements, where there are no confrontational interactions with supervisors, and only frequent contact with coworkers and the general public.

(Tr. 72).

The VE testified that such an individual could not perform Plaintiff's past work. (Tr. 72). However, the VE identified the following jobs that such an individual could perform: sorter, DICOT 222.687-014, unskilled, SVP of 2, light exertional (300,000 jobs nationally, 2,000 in Ohio); marker, DICOT 209.587-034, unskilled, SVP of 2, light exertional (200,000 jobs nationally, 2,000 in Ohio); and, laundry folder, DICOT 369.687-018, unskilled, SVP of 2, light Exertional (100,000 jobs nationally, 1,000 in Ohio). (Tr. 73).

The ALJ posed a second hypothetical that was the same as the first, except that the hypothetical individual was to have "only interaction with coworkers and no contact with the public." (Tr. 73). The VE testified that the above identified jobs would remain. *Id.*

The ALJ posed a third hypothetical mirroring the second one with the additional limitation that the hypothetical individual would be off-task up to ten percent of the workday. (Tr. 73). Again, the VE testified that the same jobs would remain. *Id.*

The ALJ posed a fourth hypothetical mirroring the third one with the additional limitation that the hypothetical individual would miss one day of work per month due to symptoms. (Tr. 74). Again, the VE testified that the same jobs would remain. *Id.* An increase to two absences per month would eliminate all jobs. *Id.*

Plaintiff's counsel inquired as to the impact of a limitation where an individual needed to work in isolation. (Tr. 74). The VE responded that the jobs identified are typically performed alone away from the general public *Id.* However, the VE noted that a job requiring complete isolation, meaning no contact with coworkers or supervisors, would dramatically decrease the positions available. (Tr. 74-75).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he/she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's

impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since June 15, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: diabetes; bipolar disorder; agoraphobia; panic disorder; and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with certain restrictions. Specifically, the claimant can perform unskilled work that can be learned in 30 days or less. She can perform work tasks in a static and low stress environment, which I define as one where the work tasks are routine, repetitive and predictable, and where there are few changes that occur in the workplace. When workplace changes do occur, those changes are introduced gradually and are easily explained or demonstrated. The workplace must have no high production quotas, fast paced demands or strict time requirements.   The claimant cannot have confrontational interactions with supervisors. She can have occasional interaction with coworkers but no contact with the public. The claimant may be off task up to 10% of the workday due to her symptoms and she may have up to one absence per month because of treatment or symptoms.

6. The claimant is unable to perform any past relevant work (20 CFR

404.1565 and 416.965).

7. The claimant was born on September 16, 1973 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-25).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.

*Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512

**B. Plaintiff's Assignments of Error**

### 1. The Weight Ascribed to the Opinions of a Treating Psychiatrist[5]

---

[5] New regulations effective March 27, 2017, 20 C.F.R. §§ 404.1527 & 416.927 set forth the rules for evaluating opinion evidence, both medical and nonmedical, for claims filed *before* that date. Conversely, 20 C.F.R. §§ 404.1520c & 416.920c set forth the rules for evaluating such evidence for claims filed *on or after* March 27, 2017. The latter regulations, not applicable to the present case, eliminate the term "treating source," as well as what is customarily known as the "treating source rule." *See also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 FR 62560 at 62573-62574 (Sept. 9, 2016) ("we would no longer give a specific weight to medical opinions … this includes giving controlling weight to medical opinions from treating sources … [and] [w]e would not defer or give any specific evidentiary weight, including controlling weight, to any … medical opinion, including from an individual's own healthcare providers.") It bears noting that the current iterations of §§ 404.1527 & 416.927, while purporting to apply to claims filed *before* March 27, 2017, are not identical in language to the version in effect at the time of the ALJ's decision. For the sake of consistency, the court continues to cite the language from the former regulation sections that were in effect at the time of the ALJ's decision. Furthermore, while the current language of the regulations has been modified and renumbered, the changes, on their face, do not appear to be substantive and would not alter this court's recommendation. As noted by the Social Security Administration (SSA), for cases filed before March 27, 2017, it "will continue to apply [its] current rules for evaluating evidence from a treating source …." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844 at 5861 (Jan. 18, 2017). Thus, the SSA also does not perceive its changes to be substantive.

In the first assignment of error, Plaintiff asserts that the ALJ erred by failing to set forth good reasons for failing to credit a number of marked and restrictions as set forth by her treating psychiatrist, Dr. Ike, in a January 2015 assessment. (R. 14, PageID# 946-953). Conversely, the Commissioner avers that the ALJ reasonably weighed the opinion evidence from Dr. Ike, and reading the opinion as a whole, gave good reasons for doing so. (R. 15, PageID# 964-966). Alternatively, the Commissioner argues that any error was harmless, and that Dr. Ike's opinion was based on Plaintiff's subjective complaints, and that the checklist opinion was unsupported. (R. 15, PageID# 966-971).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188*, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of

their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson, 378 F.3d at 544* (*quoting Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999)*); *see also Johnson v. Comm'r of Soc. Sec., 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016)* ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart, 192 Fed. App'x 456, 465 (6th Cir. 2006)* ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990)*). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec., 342 Fed. App'x 149, 157 (6th Cir. 2009).* If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec., 658 Fed. App'x 248, 253-254 (6th Cir. 2016)* (*citing Morr v. Comm'r of Soc. Sec., 616 Fed. App'x 210, 211 (6th Cir. 2015)*); *see also Keeler v. Comm'r of Soc. Sec., 511 Fed. App'x 472, 473 (6th Cir. 2013)* (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

The ALJ addressed Dr. Ike and Ms. Murphy's January 2015 opinion as follows:

> In January 2015, the claimant's counselor, Janet M. Murphy LPCC, completed a form assessing the claimant's ability to perform work-related mental activities (Ex 23F). This form was cosigned by the claimant's psychiatrist, Dr. Ike. The claimant was opined to have various limitations, ranging from mild to extreme. However, the most significant limitations included a marked restriction in the claimant's ability to relate to others, marked restriction in her daily activities, extreme limitation in her ability to respond appropriately to changes in a work setting, marked limitation in performing complex tasks, and an extreme limitation in behaving in an emotionally stable manner (Ex 23F:2-3). The claimant was further opined to miss [work] more than three times per month. Ms. Murphy and Dr. Ike noted that the claimant has improved with medication, however.

> I cannot afford great weight to this opinion as such severe limitations are inconsistent with the claimant's longitudinal mental health history as well as generally inconsistent with her testimony at the hearing. Nonetheless, I have accounted for most of the limitations opined by Ms. Murphy and Dr. Ike in the claimant's residual functional capacity assessment set forth above. However, the opinion that the claimant would be absent from work more than three times a month is not supported anywhere in the record or even by the claimant's own testimony. There is no evidence that the claimant has ever left a job, voluntarily or otherwise, because of mental health symptoms.

> In fact, the record shows that the claimant wanted to return to work and did so for two days. The reason it was for only two days involved the claimant's smoking rather than her mental health symptoms. The record also shows that the claimant sought training to become a medical coder in order to find employment (Ex 2F: 18, 26). However, after beginning her classes she decided it was not affordable as she did not receive expected student loan money (Ex 2F:33).

> For these reasons I give only some weight Ms. Murphy and Dr. Ike's opinion.

(Tr. 22-23).

First, the Commissioner has argued that the check-box or checklist format of Dr. Ike's opinion renders it unsupported. (R. 15, PageID# 970-971). "Supportability" is one of the factors specifically set forth in the regulations used to evaluate opinion evidence, and states that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that opinion. The better an

explanation a source provides for an opinion, the more weight we will give that opinion" 20

C.F.R. § 404.1527(c)(3). Numerous decisions have found that the use of checklist or check-the-

box forms that contain little to no accompanying explanation for the assessed limitations, such as

the one used herein by Dr. Ike and Ms. Murphy, are unsupported and, therefore, the ALJ may

properly reject treating source opinions contained in such forms.[6]

In her reply, Plaintiff responds to this argument by pointing out that the ALJ did not cite the

check-box format of Dr. Ike's opinion as a basis for rejecting portions thereof. (R. 16, PageID#

979). She suggests the Commissioner's argument amounts to improper *post hoc* rationale. Based

on recent decisions from the Sixth Circuit Court of Appeals, the court disagrees that the

checkbox format of a treating source's opinion is irrelevant unless the ALJ specifically calls

attention to it in his or her decision. In *Ellars v. Commissioner of Social Security*, the Sixth

---

[6] *See, e.g., Kepke v. Comm'r of Soc. Sec.*, No. 15-1315, 636 Fed. App'x 625, 2016 WL 124140
at *4 (6th Cir. Jan. 12, 2016) ("Dr. Chapman's checklist opinion did not provide an explanation
for his findings; therefore, the ALJ properly discounted it on these grounds."); *accord Langlois
v. Colvin*, No. 3:15-CV-01682, 2016 WL 1752853 at *8 (N.D. Ohio May 3, 2016) (Vecchiarelli,
M.J.) (finding the ALJ did not err by rejecting a treating source's unexplained checklist opinion);
*see also Hyson v. Comm'r of Soc. Sec.*, No. 5:12CV1831, 2013 WL 2456378, at *14 (N.D. Ohio
June 5, 2013) (Burke, M.J.) (finding that because Dr. Martinez merely checked the boxes on the
form while leaving those sections of the form blank where she was to provide her written
explanation, she failed to provide any substantive basis for her conclusions and the ALJ was not
required to accept her opinions); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("We
have held that the ALJ may 'permissibly reject[] ... check-off reports that [do] not contain any
explanation of the bases of their conclusions.'") (citations omitted); *Smith v. Astrue*, 359 Fed.
App'x 313, 316 (3d Cir. 2009) ("checklist forms ... which require only that the completing
physician 'check a box or fill in a blank,' rather than provide a substantive basis for the
conclusions stated, are considered 'weak evidence at best' in the context of a disability
analysis.") (citations omitted); *cf. Price v. Comm'r SSA*, 342 Fed. App'x 172, 176 (6th Cir. 2009)
("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion
regarding [claimant's] impairments, the ALJ did not err in discounting his opinion.")

Circuit agreed with "the district court that the [ALJ] gave 'good reasons' for not affording Dr. Schall's opinion controlling weight." 647 Fed. App'x 563, 568 (6ᵗʰ Cir. 2016). The *Ellars* court explained as follows:

> Dr. Schall's evaluation consisted of a two-page form on which he entered check marks in the blanks regarding plaintiff's physical limitations…. Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's "check-off form" of functional limitations that "did not cite clinical test results, observations, or other objective findings…." …. These cases recognize that the administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence. In the "REMARKS" section of the Physical Capacity Evaluation, Dr. Schall simply noted plaintiff's impairments consisted of severe peripheral vascular disease, coronary artery disease, COPD, depression and anxiety. These remarks were not sufficient to explain Dr. Schall's findings.

*Id*. at 566-567 (internal citations omitted). In *Ellars*—as in the case at bar—the ALJ's analysis of the treating source's opinion did not actually identify the checkbox format of the opinion in question as a reason for discounting it. *Ellars v. Comm'r of Soc. Sec.*, No. 2:14cv2050, 2015 WL 3537442 at *3 (S.D. Ohio Jun. 4, 2015) (the ALJ only observed that the medical opinion was "conclusory," and provided "very little explanation"), *report and recommendation adopted sub nom. Ellars v. Colvin*, 2015 WL 4538392 (S.D. Ohio Jul. 27, 2015).[7] Despite the ALJ failing to expressly cite the unsupported checkbox format as a basis for ascribing less weight to the treating source's opinion, the Sixth Circuit, nevertheless, affirmed the rejection of the treating source's opinion based on said format. Therefore, this court disagrees that the Commissioner's argument consists of an impermissible *post hoc* rationale

---

[7] The ALJ's discussion of Dr. Schall's opinion was quoted in the magistrate judge's report and recommendation. 2015 WL 3537442 at *3.

Another decision from the Sixth Circuit goes even further and determined that a check-box opinion, unaccompanied by any explanation, is "'weak evidence at best' and meets our patently deficient standard." *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 475 (6th Cir. 2016) (*citing Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010)).[8] The *Hernandez* decision explained that "[e]ven if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error" where the opinion in question was an unsupported check-box opinion. *Id*.; *accord Toll v. Comm'r of Soc. Sec.*, No. 1:16cv705, 2017 WL 1017821 at *4 (W.D. Mich. Mar. 16, 2017) (finding that "even if the ALJ failed to provide good reasons" for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a check-box worksheet lacking any explanation beyond a diagnosis); *Denham v. Comm'r of Soc. Sec.*, No. 2:15cv2425, 2016 WL 4500713, at *3 (S.D. Ohio Aug. 29, 2016) ("The magistrate judge also correctly found that any error in the ALJ's consideration of Lewis's evaluation was harmless because the check-box form was so patently deficient that the Commissioner could not possibly credit it," and observing that "[t]he Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his findings.")

Dr. Ike's and Ms. Murphy's January 2015 opinion mirrors the unexplained and unsupported checklist opinions disfavored in the above cases. As set forth in the recitation of the medical evidence, *supra*, the form consists of nothing but checked boxes coupled with her diagnoses. (Tr.

---

[8] The *Friend* decision identified three instances where a violation of the treating physician rule would be harmless error. 375 Fed. App'x at 551. The first instance, found applicable by the *Hernandez* court, was where "a treating source's opinion is so *patently deficient* that the Commissioner could not possibly credit it." *Id.* (emphasis added).

779-780). It is entirely bereft of any explanation as to the basis of the assessed limitations and fails to cite any support (objective findings, observations, etc.) that tend to support the limitations. *Id.* The opinion also states that Plaintiff is "improved w/ medication," but does not clarify whether the assessed limitations reflect her status with or without medication. *Id.* Adding to the unsupported nature of the opinion is Dr. Ike's indication that the severity level of Plaintiff's limitations has persisted since at least December 31, 2007 despite the fact that Dr. Ike first saw the Plaintiff over five years later on February 11, 2013. (Tr. 545). Based on the *Hernandez* decision, the court finds that Dr. Ike's opinion similarly is "patently deficient" and the ALJ did not err by failing to credit it in its entirety.

Furthermore, the ALJ gave additional reasons for discounting Dr. Ike's opinion. These included the ALJ's observation that Dr. Ike's opinion was inconsistent with Plaintiff's longitudinal mental health history. (Tr. 22). Earlier in the decision, the ALJ specifically noted the "lack of any additional positive findings" on mental status examination that would have warranted the lowered GAF scores assigned by Dr. Ike. *Id.* The ALJ also noted that throughout much of Plaintiff's mental health treatment, her complaints revolved primarily around financial difficulties. *Id.* The ALJ also noted that the extent of the limitations assessed by Dr. Ike were inconsistent with the Plaintiff's hearing testimony. (Tr. 22). Though not clearly explained, this statement is not unreasonable given Plaintiff's history of working part-time without issue during the time period the limitations allegedly existed. (Tr. 43-47). Plaintiff's brief cites evidence that she believes demonstrates the validity of Dr. Ike's opinion. (R. 14, PageID# 949-953). However, as this court does *not* reweigh the evidence, Plaintiff's identification of evidence tending to bolster the treating source's opinion does not render the ALJ's reasons for discounting the

opinion deficient. In other words, Plaintiff has attempted to remedy the lack of supportability by using her Brief on the Merits to fill in the gaps.

The Court finds that Plaintiff's first assignment of error is without merit, as Dr. Ike's opinion was patently deficient, and the ALJ gave sufficient reasons for not adopting in full the unsupported check-box opinions contained in the January 2015 assessment.

**2. Weight Ascribed to State Agency Physicians and Psychologists**

In the second assignment of error, Plaintiff asserts that the ALJ erred by failing to specifically discuss the weight assigned to State agency psychologists Drs. Rudy and Johnston, or to State agency physician Dimitri Teague, M.D.[9] (R. 14, PageID# 953-955).

The regulations state that ALJs " are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists," but ALJs must "consider" their opinions in accordance with the same factors used to review other medical source opinions, because they are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i).

As recounted above, Drs. Rudy and Johnston primarily found Plaintiff was "not

---

[9] In her initial brief, Plaintiff had argued that the ALJ failed to incorporate Dr. Teague's opinion that Plaintiff needed to avoid concentrated exposure to pulmonary irritants into the RFC. (R. 14, PageID# 954-955). The Commissioner responded by arguing that the failure to address Dr. Teague's opinion was harmless error, as none of the jobs identified by the VE that Plaintiff could perform requires exposure to pulmonary irritants according to the DICOT. (R. 15, PageID# 973-975). In Plaintiff's reply, Plaintiff stated that "[u]pon reviewing Defendant's thoughtful brief, Gallagher concedes that this issue likely does not necessitate remand." (R. 16, PageID# 982). The court appreciates counsel's candor and considers the argument withdrawn as it pertains to Dr. Teague.

significantly limited" in most areas of mental functioning, but did note three areas where she was "moderately limited." (Tr. 83-85, 118-119). The Commissioner asserts that the RFC is consistent with the mental restrictions assessed by the State agency physicians. (R. 15, PageID# 972-973). The court agrees. Plaintiff seizes on the State agency psychologists' observations that she would "perform best" in an isolated environment, and suggests the RFC was inaccurate because it did not include a prohibition against any contact with coworkers or supervisors.[10] (R. 14, PageID# 954). Plaintiff's piecemeal interpretation of the State agency psychologists' opinion is untenable. There is no indication that they believed a complete prohibition against any contact with coworkers was necessary. To the contrary, looking at their opinions in their entirety, they found Plaintiff was *not significantly limited* in her ability to work in coordination with or in proximity to others without being distracted by them, to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or to maintain socially appropriate behavior. (Tr. 84-85, 118-119). Therefore, the suggestion that the State agency psychologists believed Plaintiff required a complete prohibition against contact with coworkers and supervisors is inaccurate. As such, the corresponding assertion—that the RFC implicitly rejected the State agency psychologists' opinions—is also inaccurate. The RFC explicitly limited Plaintiff to a low stress environment defined as one where the work tasks are routine, repetitive and predictable, and involve few workplace changes that are introduced

---

[10] Plaintiff also cites the VE's testimony that complete isolation, if defined as no contact with coworkers or supervisors, would dramatically decrease the positions available. (R. 14, PageID# 954, *citing* Tr. 74-75). However, as explained in the body of this report and recommendation, the State agency opinions cannot reasonably be interpreted as requiring complete isolation, as such an interpretation conflicts with the remainder of their opinions.

gradually and are easily explained or demonstrated. (Tr. 19). Plaintiff was further limited to no

high production quotas, fast paced demands, or strict time requirements, and the RFC also

prohibited confrontational interactions with supervisors, allowed only occasional interaction with

coworkers, and prohibited contact with the public. *Id*. Save for Plaintiff's unsupportable

argument that Drs. Rudy and Johnston believed Plaintiff had to work in complete isolation,

which would contradict the remainder of their opinions, Plaintiff offers no explanation as to how

these limitations in the RFC fail to account for the three areas of mental functioning where

moderate limitations were indeed assessed.

Therefore, the court finds no error in the ALJ's failure to explain the weight ascribed to the

opinions of State agency Drs. Rudy and Johnston, as the RFC reasonably incorporates the

limitations assessed in their respective opinions.

### IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: June 12, 2017

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. **28 U.S.C. § 636(b)(1).** Failure to file objections within the specified time may waive the right to appeal the district court's order. *See United States v. Walters***, 638 F.2d 947 (6**[th] **Cir. 1981);** *Thomas v. Arn***, 474 U.S. 140 (1985),** *reh'g denied***, 474 U.S. 1111 (1986).**

24